NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

Juan MENDEZ, et al.,

        Plaintiffs,

v.

PUERTO RICAN INTERNATIONAL
COMPANIES, INC., et al.,

        Defendants.

Civ. No. 05-174

(Consolidated with
No. 05-199)

MEMORANDUM OPINION

THOMPSON, U.S.D.J.[1]

    The above-captioned consolidated matter[2] is before the Court on the joint motion of

Defendants Fluor Corporation ("Fluor"), Fluor Enterprises, Inc. ("FEI"), Plant Performance

Services, LLC ("P2S"), Plant Performance Services International, Ltd ("PPSI"), (collectively,

the "Fluor Defendants"), and Hovensa, LLC (Hovensa and the Fluor Defendants are collectively

referred to herein as "Defendants"),[3] for summary judgment on the merits pursuant to Federal

Rule of Civil Procedure 56.[4]  (Doc. Nos. 618, 619).  Plaintiffs[5] have opposed.  (Doc. No. 655).

---

[1] The Hon. Anne E. Thompson, United States District Judge for the District of New Jersey,
sitting by designation.

[2] This case has been consolidated with *Shawn Smith, et al. v. Puerto Rican Int'l Cos., et al.*, Civ.
No. 05-199.  The two cases were consolidated on March 24, 2006.  (*Smith*, Civ. No. 05-199,
Doc. No. 27).  For ease of analysis, where this Opinion refers to a document that has been
submitted to both case dockets, the citation will reflect the document as numbered in *Mendez*,
Civ. No. 05-174, the lead case.  Any exception will be noted.

[3] Defendant Puerto Rican International Companies, Inc. ("PIC") appears not to have participated
in the litigation, mediation, or subsequent negotiations for some time.  For the purposes of this
Opinion, use of the word "Defendants" does *not* make reference to PIC, and references to
settlements, dismissals, and motion practice only refer to the Fluor Defendants and Hovensa.

[4] This motion was filed under seal pursuant to the stipulated confidentiality agreement approved
by the Court.  (Doc. Nos. 311, 346).  Similarly, this Opinion should also be filed under Seal.

The Court has issued the Opinion below based upon the written submissions of the parties and without oral argument pursuant to Federal Rule of Civil Procedure 78(b).  For the reasons stated herein, the Court will grant in part and deny in part Defendants' motion.

PROCEDURAL HISTORY

This matter, which was assigned to the undersigned New Jersey District Court judge on May 20, 2013, (Doc. No. 761), has undergone significant changes over the span of its seven year pilgrimage through the court system in terms of parties and procedural posture.  Given the extensive nature of the docket and the assured familiarity of the parties with its many and varied particulars, the Court will provide here only a brief summary of the relevant procedural history.

In late 2005, a combined 48 Plaintiffs filed the two complaints underpinning the present consolidated action, asserting claims of discrimination based upon race, color, and national origin.  (*Mendez*, Doc. No. 1; *Smith*, Doc. No. 1).  After consolidation and amendment, the final iteration of the pleadings contains allegations of: (1) violations of Title VII of the Civil Rights Act of 1967 ("Title VII"), 42 U.S.C. §§ 1000e, *et seq.*; (2) violations of the Virgin Islands Civil Rights Act ("VICRA"), 10 V.I.C. §§ 1-10, §§ 64, *et seq.*, 24 V.I.C. § 451; (3) breach of the implied covenant of good faith and fair dealing; (4) violations of the Virgin Islands Wrongful

---

[5] There are currently seven Plaintiffs active in this litigation: Bienvenido Carrasco, Raquel Concepcion, Jose Gonzales, Orlando Pagan, Michael Bynoe, Shawn Smith, and Juan Mendez. Originally, this action involved 48 Plaintiffs.  Eight Plaintiffs were ordered to engage in arbitration, and settled their claims: Thomas Dupari, Pius Aurelien, Ira Claxton, Bertril Williams, Mark Vitalis, Joseph Oscar, Gregory LaForce and Nathaniel Hobson.  In March 2012, the remaining Plaintiffs engaged in mediation, with the result that an additional 22 Plaintiffs settled: Sabino Castillo, Alfredo Diaz, Orson Flemming, Maximo Guerrero, Marcel Hippolyte, Miguel Liriano, Joseph Nicholas, Humberto Ortiz, Marco Rijo, Ernesto Rodriguez, Catherine Sabin, Cyril Thomas, Angel Lopez, Angel Martinez, Jorge Rodriguez, Marcelo Landers, Elrod Baptiste, Sostenes Montilla, Carlos Garcia, Keith Simon, George Acosta, and Rudolph Kock.  Three Plaintiffs, Alfred James, Luis Medina, and Josh Gondelec were dismissed for failure to prosecute their claims pursuant to Federal Rule of Civil Procedure 41(b).  (Doc. No. 839 ).  Finally, the parties have informed the Court stipulations of settlement are pending with regards to Sandro Rivera, Sencion Guerrero, Felipe Figueroa, Robert Jones-Charleman, Waldemar Olmeda, Mercedes Cruz, Heriberto Laboy, and Lucho Hernandez.  (Doc. Nos. 785, 840).

Discharge Act, 24 V.I.C. §§ 76-79; (5) intentional and/or negligent infliction of emotional

distress; (6) tortious interference with an employment relationship; and (7) punitive damages.

(Doc. No. 558, Second Amended Complaint).

In the intervening period between initiation of suit and the present motion for summary

judgment, 41 Plaintiffs and 4 Defendants have been dismissed from this action.  Eight Plaintiffs

settled following the Court's August 2007 partial grant of a motion to stay proceedings pending

arbitration.  (*Mendez*, Doc. Nos. 26, 110, 781, 785; *Smith*, Doc. No. 19).  An additional 22

Plaintiffs settled following mediation proceedings in March 2012.  (Doc. Nos. 781, 785).  Three

Plaintiffs were subsequently dismissed for failure to prosecute their claims under Federal Rule of

Civil Procedure 41(b), (Doc. No. 839); and summary judgment was granted in favor of Hovensa,

Fluor, FEI, and P2S based upon a lack of joint employer status.  As of the writing of this

Opinion, the Court has received word that a further eight Plaintiffs have settled, stipulations

pending.  (Doc. No. 785, 840).

For the purposes of this motion, then, only PPSI of the moving Defendants, and

Bienvenido Carrasco, Raquel Concepcion, Jose Gonzales, Orlando Pagan, Michael Bynoe,

Shawn Smith, and Juan Mendez of the opposing Plaintiffs, remain active in this litigation.

## FACTUAL BACKGROUND

The discrimination claims at issue in this suit stem from Plaintiffs' work at the Hovensa

Refinery.  Specifically, in or around 2004, Hovensa contracted with General Electric ("GE") to

manage the FCC expander project (hereinafter, "the project") at its refinery in St. Croix.  (Doc.

No. 620, Statement of Undisputed Material Facts ("SUMF"), ¶¶ 1, 2).  GE, as Hovensa's agent,

contracted with PPSI to serve as general contractor for the project's mechanical work and

construction services.  (Doc. No. 620, SUMF, ¶¶ 3-4, 12).  PPSI in turn sub-contracted with a

company called Puerto Rican International Companies ("PIC") for general mechanical work services, including the installation of valves and pipes and minor electrical work. (Doc. No. 620, SUMF, ¶ 19).

Legally, PIC was not a subsidiary of PPSI and, in fact, was contractually designated an independent contractor. (Doc. No. 620, SUMF, ¶¶ 20-21). According to the subcontract, PIC was to be responsible for the supervision of all PIC employees on the project, (Doc. No. 620, SUMF, ¶ 20), and was to be "solely responsible for determining the means and methods of performing the work." (Doc. No. 620, SUMF, ¶ 20). On the other hand, PPSI reserved the right to either reduce or expand the size of PIC's work scope, (Doc. No. 620, Att. 12, Ex. L, PPSI-PIC Subcontractor Agreement, ¶ 6.1), and the subcontract specified that the "Contractor [PPSI], agent, and/or Hovensa shall have the option, at their sole discretion, to require [PIC] to remove and/or replace personnel at [PIC's] expense." (Doc. No. 620, Att. 12, Ex. L, PPSI-PIC Subcontractor Agreement, ¶ 22.1). After contracting with PPSI, PIC hired Plaintiffs for the purposes of welding, pipefitting, and other labor, (see Doc. No. 620, SUMF, ¶¶ 19, 28), and each Plaintiff admits that he or she was PIC's employee.[6] (Doc. No. 620, SUMF, ¶ 28).

---

[6] Although the Second Amended Complaint makes general contentions of discriminatory hiring practices, the statements of undisputed material facts on record do not bear out any such discrimination, at least with respect to Plaintiffs' initial hiring. The Court notes that the deposition testimony of Plaintiff Smith is an exception, in that Smith testified that he applied for a position as a pipefitter and was told there were no more pipefitter positions available, despite the fact that he believed pipefitters continued to be hired following his application. (Doc. No. 490, Smith. Dep. 74:20-75:6, 75:21-23). He contends that he was hired instead as a pipefitter helper, a lesser-paid position, and performed the same duties as a regular pipefitter, (Doc. No. 490, Smith. Dep. 74:20-75:6). Smith testifies that when he asked PIC supervisor Mendez about a possible promotion, he received no answer. (Doc. No. 490, Smith. Dep. 75:22-76:11). Interestingly, neither Defendants nor Plaintiffs make this a point of contention in their briefing or in their facts section, merely agreeing that Smith was actually a rigger. (Doc. No. 644, Att. 1, RSOF, ¶ 99a). Thus, the Court will disregard Smith's testimony concerning pipefitting for the purposes of this motion.

4

Plaintiffs assert that during their employment, they suffered various types of discrimination at the hands of PIC and PPSI. The most significant of these claims involves a particular incident between a PPSI supervisor and a PIC employee (referred to herein as the "Saucier-Pagan Incident" or the "Incident") and the events subsequent.

At some point in September 2004, Bobby Saucier, a PPSI supervisor in charge of rigging, made allegedly derogatory racial comments to PIC employee and Plaintiff Orlando Pagan and other members of Pagan's team. (Doc. No. 620, SUMF, ¶¶ 45, 46). In his deposition, Pagan, whose wife is black, testified that Saucier used the word "niggers" in the following context:

> A. From his mouth it came out, "where are those black riggers?"
> Q. . . . Did Bobby say the word niggers?
> A. At a certain time, yes.
> Q. When did he say that word?
> A. And when I said, "Why riggers"; and he said, "Because they're niggers. In my country they're called colored boys."

(Doc. No. 644, Att.1, Responsive Statement of Facts ("RSOF"), ¶47). This incident was allegedly overheard by, *inter alia*, Smith and Bynoe.

Pagan immediately reported the Incident to onsite PIC Manager Juan Mendez via radio, who then reported it to PPSI management. (Doc. No. 620, SUMF, ¶¶ 25, 48). Although there is some dispute as to the number and timing of the meetings that then followed to address the Incident, it appears that there was at least one public meeting at which Pagan publicly complained, (Doc. No. 664, Defs.' Resp. to CSOF, ¶ 25), and one public meeting at which Saucier apologized, (*see* Doc. No. 644, Att. 1, RSOF, ¶ 47 ("Saucier admitted to using the term 'nigger' at the refinery when he was forced to apologize to the PIC employees in the safety meeting."); Doc. No. 664, Defs.' Resp. to CSOF, ¶ 32 ("During the meeting, Saucier was asked to apologize, which he did."). There is also testimony that at a certain public meeting, the management in attendance cut short the public dialogue about Saucier's racist statements. (Doc.

No. 644, Att. 1, CSOF, ¶ 33; Doc. No. 645, Att. 13, Ex. 25, Pagan Dep. at 33:18-21 ("and the big boss from P2S[/PPSI] said that [Saucier's racist statements] wasn't a problem for resolving there because everybody was there present and they didn't want any problems."); *see also* Doc. No. 646, Att. 12, Ex. 37, Gonzalez Dep. 21-22) ("one of the bosses" or the "big boss" from P2S[/PPSI]" stated "let[s] not talk about it [the complaints of racism] here . . . or let's not talk about it further here.")).

It is undisputed that Hovensa, PPSI, and GE held a smaller, private meeting the same day as the Incident.  (Doc. No. 620, SUMF, ¶ 55).  Those present at the meeting included Mendez and Pagan, as well as PPSI's Clay Redford, Plant Manager, and PPSI's Andy Herrera, Construction Manager.  (Doc. No. 644, Att. 1, CSOF, ¶ 27; Doc. No. 664, Defs.' Resp. to CSOF, ¶ 27).  According to Mendez, management from Hovensa and PPSI indicated they would take care of the problem.  (Doc. No. 644, Att. 1, CSOF, ¶ 28).  However, Mendez also testified that, after the meeting, Redford stated, "PIC was going to go before Bobby [Saucier]." (Doc. No. 644, Att. 1, RSOF, ¶ 55).

According to Plaintiffs, the Saucier-Pagan Incident was not the first such incident of racially discriminatory comments.  Bynoe contends he heard comments from stateside workers and Puerto Ricans to the effect that, "those guys, these black men, they don't know what they're doing and Cruzian guys don't know what they're doing" and "these black Cruzian men;" he also purportedly heard Saucier exclaim, "God damn it, I can't work with these colored guys." (Doc. No. 620, SUMF, ¶ 65c).  Similarly, PIC employee Hernandez testified that he overheard Saucier make racist remarks, such as commenting that one of the guy's wives was "black and all of that" and "we don't need these f-ing Puerto Ricans here," (Doc. No. 620, SUMF, ¶ 68d), and that PPSI's Herrera made statements such as, "they should let me bring all my people in

[from] Louisiana] so we could get rid of all these f-ing people" and "we don't need these f-ing Puerto Ricans."  (Doc. No. 620, SUMF, ¶ 68d).

Smith, echoing the testimony of Bynoe and Hernandez, testified that Saucier at one point stated that he "d[idn't] want to work with those colored boys," (referring to Smith and Bynoe), (Doc. No. 620-60, Excerpts Smith Dep., 52:12-53:7), and that while Saucier might not have always used explicit racial slurs, he would use the word "boy," or would say things like "Hey you," or "stupid."  (Doc. No. 620, Att. 60, Smith Dep. 56:14-17; 57:1-15).  PIC employee Rudolfo Kock testified that he overheard Saucier use racial slurs, such as "have all those niggers working," "make them work hard," "niggers," and "spics."  (Doc. No. 640, Att. 6, Ex. 43, Kock Dep., 21-22).  Bynoe, Smith, and Kock all testify as to complaining to PIC, PPSI, or Hovensa management.

While there is little evidence of action taken based upon these previous incidents, Saucier *was* issued a warning and a reprimand following the Saucier-Pagan Incident,[7] (Doc. No. 620, SUMF, ¶ 54; Doc. No. 644, Att. 1., CSOF, ¶ 34), and there is no evidence that he continued to utilize racist commentary thereafter.[8]  (*See, e.g.*, Doc. No. 644, Att. 8, Ex. 7, Smith Dep. 69:13-18; Doc. No. 645, Att. 2, Ex. 14, Mendez Dep. 72:13-16).  Some Plaintiffs offered testimony, however, that the relationship between PIC and various members of the PPSI management team deteriorated after the Incident.  (*See, e.g.*, Doc. No. 644, Att. 1, ¶¶ 68b, 68c, Concepcion

---

[7] Moreover, Saucier admitted in deposition and during PPSI's investigation that he made statements along the lines of "those two black guys over there" and "colored boys," and used inappropriate language when frustrated with work on the project.  (Doc. No. 620, SUMF, ¶¶ 47, 53).

[8] It should be noted that Plaintiff Smith, in testifying that there were no more racist comments from Saucier following the incident, also indicated that he and others were removed from Saucier's supervision.  (Doc. No. 644, Att. 8, Ex. 7, Smith. Dep. 69:13-18).  Similarly, Mendez testifies that there were no further racist comments because there was no further communication. (Doc. No. 645, Att. 2, Ex. 14, Mendez Dep. 72:13-18).

(testifying that the attitude of PPSI management was negative after the meeting concerning the racist comments, and that after the apology meeting, Saucier would not look at or speak with her); Doc. No. 645, Att. 2, Ex. 14, Mendez Dep. 72:13-73:9).  As one example, Smith contends that he complained to Redford that Saucier's apology was insufficient, and that Redford responded in a harassed fashion that Saucier had apologized and that it would not happen again. (*See* Doc. No. 620, Att. 60, Ex. FFF, Smith. Dep. 67:19-24; 68:1-12).  Smith asserts that after these complaints, the attitude "change[d] with . . . a lot of the management."  (Doc. No. 620, Att. 60, Ex. FFF, Smith. Dep. 57:21-23).

Four to six weeks after the Saucier-Pagan Incident and the events following, the first of two major layoffs occurred.  On or about October 25, 2004, PPSI Project Manager Clay Redford had a meeting with PIC General Project Manager Pedro Laboy and PIC Construction Manager Hector Viera.[9]  (Doc. No. 620, SUMF, ¶ 31; Doc. No. 664, Resp. CSOF, ¶ 35).  In its moving papers, PPSI alleges that it had begun experiencing problems with PIC's productivity, the number of PIC employees on the jobsite, and the number of overtime hours requested. (Doc. No. 620, SUMF, ¶ 30).  Laboy testified that upon arrival at the meeting, Redford had a list of PIC employees to be terminated, including onsite Project Manager Mendez.  (Doc. No. 644, Att. 1, CSOF, ¶ 36; Doc. No. 664, Resp. to Pls.' CSOF, ¶ 36).  Redford and Laboy purportedly discussed Mendez's termination and replacement by PIC employee Jose Chavez, (Doc. No. 644, Att. 1, CSOF, ¶¶ 37-38; Doc. No. 664, Resp. to CSOF, ¶ 36), and negotiated keeping some of the employees listed for termination.  (Doc. No. 644, Att. 1, CSOF, ¶¶ 37-38;

---

[9] There is some dispute among the parties as to Hector Viera's position at the time of the events in the record.  The Court has chosen the title "Construction Manager," as that is how Viera signed Plaintiffs' October termination letters.  (Doc. No. 617, Att. 14, Ex. N, Excerpts from Deposition of Pedro Laboy, October 25, 2004 termination letter)

Doc. No. 664, Resp. to CSOF, ¶ 36).  Thereafter, PIC terminated Mendez and several employees.  (Doc. No. 620, SUMF, ¶ 32).

A second layoff occurred in December 2004.  (Doc. No. 620, SUMF, ¶¶ 37-38). Defendants contend that this layoff was due to the termination of PPSI's contract with Hovensa/GE, and have put forth evidence that in November 2009, Hovensa/GE advised PPSI of the termination of its written contract.  (Doc. No. 620, SUMF, ¶ 35; Ex. A, Hovensa Project P2S Termination Letter, dated November 26, 2004).  This notice appears to have followed several previous notice letters in which Hovensa/GE indicated concern over the status of the project. (Resp. to CSOF, ¶ 35; Ex. A, Hovensa Project P2S Termination Letter, dated November 26, 2004).  After receipt of the November notification, PPSI terminated its contract with PIC, (Doc. No. 620, SUMF, ¶¶ 35-36), and the remaining PIC employees received a letter from PIC Project Manager Jose Chavez of their December layoff date.  (Doc. No. 620, SUMF, ¶¶ 37-38).  Of the Plaintiffs still active in this litigation, only Smith appears to have been laid off in December. (Doc. No. 620, SUMF, ¶ 99a).

After termination of the GE-PPSI contract, some of the work previously performed by PIC employees went to subcontractor JVVI, while other portions went to subcontractors SUN and Merit.  (Doc. No. 620, SUMF, ¶ 42).  For their part, Plaintiffs allege that they felt discriminated against following their termination because they either witnessed, believed, or heard that other workers, namely statesiders, were hired to do their jobs, and because the termination followed on the heels of the Saucier-Pagan Incident.  Former PIC employees complained to the Virgin Islands Department of Labor on the alleged basis that the jobs they were performing were being given to employees from outside the Virgin Islands, and protests were held outside the refinery gates.  (Doc. No. 620, SUMF, ¶ 41; Doc. No. 646, Att. 5, Ex. 30,

Bynoe Dep., 64:16-22; 82, 83 (testifying that a day after his discharge, he and other discharged workers protested outside of the refinery)).

Upon combing the record, it does appear that PPSI's Herrera did testify that PPSI brought in employees from the States "to help out" at some time in December, although he does not say for which jobs or for what purpose the employees were hired. (Doc. No. 644, Att. 7, Ex. 6, Herrera Dep. 91:20-25, 92:1-14). Moreover, Plaintiff Pagan, who was rehired by PIC three weeks following his termination for different work at the refinery, reports that the replacement workers he saw at Plaintiffs' previous stations were likely to have been SUN employees. (Doc. No. 620, SUMF, ¶ 92b).

In addition to the above allegations, Plaintiffs offer other evidence of discrimination in terms of pay and benefits and the presence of derogatory graffiti in refinery port-a-johns. With regards to the former, only Bynoe of the remaining Plaintiffs offers any kind of testimony as to discriminatory payment or benefits, and his only evidence of such discrimination is that he *complained* about pay discrimination, without providing any details as to the actual discrimination itself. (Doc. No. 620, SUMF, ¶ 65b). [10]

With regards to the latter, of the eight Plaintiffs who originally testified as to the existence of race-based graffiti in the port-a-johns at the Hovensa Refinery, only Smith remains active in this litigation. (Doc. No. 620, SUMF, ¶ 59; Doc. No. 644, Att. 1, RSOF, ¶ 59). Evidence in the record indicates that the graffiti contained drawings of "naked little Puerto

---

[10] Excerpt from Bynoe's Deposition testimony regarding discriminatory treatment, Ex. Y, 50, 18:25:

Q. When did you make a complaint about your paycheck?
A. I mean, basically, you know, anytime I get a raise that I deserve or think I deserve a raise, I'll make a complaint.
Q. Was the complaint based on discrimination?
A. Sometimes I want to believe it is.

Rican men," and such phrases as "Fuck the Puerto Ricans," "[f]-negros," "niggers," "Puerto Ricans, get the fuck outta here," "Go Home," and "black man suck white cock." (Doc. No. 644, Att. 1, RSOF, ¶¶ 59, 78c, 94b, 98b). PPSI and PIC both purportedly had policies to clean or paint over any such graffiti, (Doc. No. 620, SUMF, ¶ 60; Doc. No. 644, Att. 1, RSOF, ¶ 60), a contention supported by the testimony of PIC employee Hernandez, who stated that the graffiti was painted over and the port-a-john's removed and replaced following complaints. (Doc. No. 620, SUMF, ¶ 78c). In contrast, Smith testified that there was "plenty" of racist graffiti in the port-a-johns during his tenure with PIC, and that the graffiti was never removed. (Doc. No. 644, Att. 8, Ex. 7, Smith. Dep. 144:3-11). Only one PIC employee, Jones-Charleman, testified that he actually complained to management about the graffiti. (Doc. No. 620, SUMF, ¶ 81(d)).

Finally, the Court notes that one of the remaining Plaintiffs, Carrasco, was terminated prior to the Saucier-Pagan Incident. Carrasco was terminated in August 2004, after an altercation with PPSI Supervisor Abraham Ramirez. (Doc. No. 620, Att. 28, Ex. Z, "I asked something there in the work, in the field, and like he didn't. Like he was in a bad, bad state. And so I don't know what he understood."). Carrasco alleges that during the altercation, Ramirez said, "fucking Dominican." (Doc. No. 620, SUMF, ¶ 66b). Co-Plaintiff and PIC manager Mendez then informed Carrasco that he was fired due to "an encounter outside." (Doc. No. 620, Att. 28, Ex. Z, Carrasco Dep. 28:1-2). Carrasco further testified that during his time on the project, he was treated as though he were inferior, (Doc. No. 620, Att. 28, Ex. Z, Carrasco Dep. 33:17-21), although he admitted that no one said anything to him directly about being inferior because of his race or because of where he was from, (Doc. No. 620, Att. 28, Ex. Z, Carrasco Dep. 45:21-24).

PPSI contends that the above allegations are insufficient to support the seven Counts of the Second Amended Complaint, and has moved for Summary Judgment with respect to all counts. (Doc. Nos. 618, 619). Plaintiffs oppose, (Doc. No. 655), and the Court now decides.

DISCUSSION

## 1. **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The Court must construe all facts and inferences in the light most favorable to the nonmoving party. *Boyle v. City of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The nonmoving party must come forward with specific facts showing a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). "A factual dispute is 'genuine' and . . . warrants trial 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49, 252 (1986)).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. If a civil defendant moves for summary judgment on the basis that plaintiff has failed to establish a material fact, the judge must inquire not as to "whether [s]he thinks the evidence unmistakably favors one side or the other but[,] whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252. A mere "scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

2.  **Analysis**

As the Motion for Summary Judgment on the Merits challenges the Second Amended Complaint in its entirety, the Court will consider each count in turn.

A.  Count I: Violations of Title VII, 42 U.S.C. §§ 1000e, *et seq.*; 42 U.S.C. § 1981

In Count I of the Second Amended Complaint, Plaintiffs allege that they were discriminated against in their hire, pay, benefits, promotions, transfer, job assignments, and treatment on the basis of race, color, and national origin in violation of Title VII.[11] 42 U.S.C. § 2000e-2 (making it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin").  Plaintiffs' claims of retaliatory termination and hostile work environment also fall within the purview of Title VII, and thus will be evaluated here.

In analyzing Plaintiffs' claims under Title VII, the Court applies the familiar three-part framework enumerated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, a plaintiff must first make a *prima facie* case of discrimination – a relatively "low bar" in the context of employment disputes.  *Scheidemantle v. Slippery Rock University State System of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006); *see also Ezold v. Wolf*, 983 F.2d 509, 523 (3d Cir. 1993) ("In Title VII cases involving a dispute over subjective qualifications, we have recognized that the qualification issue should often be resolved in the second and third stages of the *McDonnell Douglas* [analysis] . . . to avoid putting too onerous a burden on the plaintiff.") (internal citations and quotation marks omitted).  A plaintiff seeking to make such a *prima facie* showing must demonstrate that plaintiff (1) belongs to a protected class; (2) was

---

[11] There is no dispute as to whether or not Plaintiffs fulfilled the appropriate administrative requirements for Title VII.

qualified for her position; (3) was subject to an adverse employment action despite being qualified; and (4) can show the circumstances permitted an inference of unlawful discrimination. *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003).  Alternatively, a plaintiff may demonstrate that, aside from belonging to a protected class and being qualified for her position, nonmembers of the protected class were treated more favorably.  *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000).

Once a plaintiff presents a *prima facie* case of discrimination, the law creates a presumption of unlawful discrimination.  *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir. 1995).  This triggers the second part of the *McDonnell Douglas* analysis, in which the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the adverse employment decision.  "If the employer sets forth a legitimate business explanation . . . the presumption of discriminatory intent created by the employee's *prima facie* case is rebutted and the presumption . . . drops out of the picture."  *Barber*, 68 F.3d at 698.

If the defendant can present a creditable, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff for the third part of the *McDonnell Douglas* analysis, wherein the plaintiff must show the defendant's proffered reason is pretextual.  *McDonnell Douglas*, 411 U.S. at 807.  A showing of pretext requires more than a demonstration that an employer's decision was wrong or mistaken.  *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir. 1997).  A plaintiff must show that "a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *see also Ezold*, 983 F.2d 509 (3d Cir. 1992) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  Put another way,

"[t]he nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999) (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)).

In analyzing whether Plaintiffs have put forth a *prima facie* case of discrimination under Count I, the Court notes there is no dispute as to whether Plaintiffs belong to a protected class or were qualified for their positions.  Thus, the inquiry will focus on whether or not Plaintiffs were subject to an adverse employment action despite being qualified, and can show the circumstances permitted an inference of unlawful discrimination.[12]

i.   Discriminatory Hiring, Pay, Benefits, Promotions, Transfers, Job Assignments and Termination

Beginning with Plaintiffs' claims of discrimination in terms of hire, pay, benefits, promotions, transfers, and job assignments, the Court finds there is insufficient evidence in the record to survive summary judgment.  Bynoe's vague testimony concerning complaints about inequitable pay and benefits, without more, fails to constitute even a "scintilla" of evidence as to unequal pay or benefits.  To the extent the record contains general allegations that workers from the States were paid additional benefits in the form of housing allowances and per diem payments, the Court does not find this relatively common practice to be evidence of discrimination.[13]  Otherwise, there is no evidence to support discriminatory denials or offers of promotions, transfers, or job assignments.

---

[12] Plaintiffs have failed to provide comparisons to similarly situated employees as a means to establish discrimination.
[13] Even co-Plaintiff Mendez testified as to the normal and frequent use of per diem payments in the industry and on St. Croix, and he himself received a per diem.

To the extent Plaintiffs attempt to base their claim of a discriminatory failure to hire upon PPSI's alleged hiring of statesiders following Plaintiffs' termination, the Court finds that this link is too tenuous, or, at most, supports Plaintiffs' claims of retaliatory or discriminatory termination. First, there is little evidence as to whether these statesiders actually replaced Plaintiffs. Second, there is no evidence that similarly situated employees were treated differently. Indeed, in the case of Juan Mendez, Mexican Jose Chavez was brought in as a replacement.

As concerns termination, the Court finds that, despite discriminatory comments made by PPSI supervisors over the time of Plaintiffs' employment, discussed in greater detail below in terms of the establishment of a hostile work environment or retaliatory termination, there is insufficient evidence to support a finding of discriminatory termination per se. The one exception to this conclusion is the circumstances involving the termination of Plaintiff Bienvenido Carrasco. Carrasco testified that he was fired a day after an altercation with PPSI supervisor Abraham Ramirez in which that Ramirez called him a "fucking Dominican." Although PPSI attempts to rebut the presumption of discrimination with the explanation that Carrasco was fired for cause for a dispute with a supervisor in the field, the Court finds that, given the alleged vocabulary utilized in the context of that dispute, and given Carrasco's swift termination the following day, a reasonable finder of fact could determine that Carrasco was fired based upon national origin. *See, e.g., Galloway v. Islands Mech. Contractor, Inc.*, Civ. No. 2008-071, 2012 WL 3984891 at *8 (3d Cir. Sept. 11, 2012) (finding discriminatory termination more likely where supervisor made derogatory comments during employee's termination).

ii.    <u>Hostile Work Environment</u>

Turning to Plaintiffs' claims of a hostile work environment, Plaintiffs must show "(1) that

[they] suffered intentional discrimination because of race [color, or national origin]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected [Plaintiffs]; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081-82 (3d Cir. 1996). Significantly, "[t]he discriminatory conduct must be so extreme as to amount to a change in the terms and conditions of employment." *Woodard v. PHB Die Casting*, 255 F. App'x 608, 609 (3d Cir. 2007) (citing *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005)). "Unless they are extremely severe, offhand comments and isolated incidents are insufficient to sustain a hostile work environment claim." *Id.* (citing *Caver*, 420 F.3d at 262).

In evaluating whether the asserted conduct is sufficiently extreme, the Court looks to the totality of the circumstances to establish "the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). Even if an individual act of hostility or harassment is not actionable on its own, the Court may find there is sufficient basis for relief upon view of the overall succession of events. *See Warner v. Kmart Corp.*, Civ. No. 2005-0128, 2009 WL 1476476, at * 8 (D.V.I. May 27, 2009) (quoting *Bronze Shields, Inc. v. New Jersey Dept. of Civ. Serv.*, 667 F.2d 1074, 1081 (3d Cir. 1981)). Circumstances to be considered include "[1] the frequency [and severity] of the discriminatory conduct; [2] . . . whether [the conduct] is physically threatening or humiliating, or a mere offensive utterance; and [3] whether [the conduct] unreasonably interferes with an employee's work performance." *Warner*, 2009 WL 1476476 at *9 (quoting *Clark Cnty Sch. Dist. v. Breeden,* 532 U.S. 268, 270-71 (2001) (internal quotations omitted)); *see Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57 (1986).

For guidance on the types of conduct sufficient to support a hostile work environment claim, the Court follows the lead of the District Court in *Woodard v. PBH Die Casting*, Civ. No. 04-141, 2005 WL 3093180 (W.D. Pa. Nov. 18, 2005) in turning to various Third Circuit cases. In *Cardenas v. Massey*, 269 F.3d 251 (3d Cir. 2001), for example, the Third Circuit found a hostile work environment where:

> the defendants subjected a Mexican-American plaintiff to ethnic slurs . . . dealt with disagreements by asking if the plaintiff intended to pull out a switchblade, wrote derogatory messages . . . in plaintiff's cubicle, . . . rounded the plaintiff's [evaluation] numbers downward, disproportionately assigned other minorities and trainees to the plaintiff's unit, gave him knowingly contradictory instructions and impossible-to-perform tasks, and referred to him as 'an affirmative action hire.'

*Woodward*, 2005 WL 3093180 at *3 (quoting *Cardenas*, 269 F.3d at 259).

In *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir. 1996), the Third Circuit again found a hostile work environment wherein African-American employees were, *inter alia*, referred to as "one of them" or "another one," told not to touch or steal anything, made to do menial jobs, screamed at, threatened with termination, had their time cards stolen, were falsely accused of wrongdoing, had information necessary to their jobs withheld, and were given conflicting orders. *Woodard*, 2005 WL 3093180 at *3 (quoting *Aman,* 85 F.3d at 1082-84).

In contrast to *Cardenas* and *Aman*, however, the Third Circuit declined to find sufficient evidence to support a hostile work environment in *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005), where the plaintiff based his claim of a hostile work environment on inappropriate racist comments, graffiti, and flyers that were not directed at plaintiff. 420 F.3d at 263. In rejecting the hostile work environment claim, the court concluded that the plaintiff could not show that comments directed at other people would not have been uttered but for the *plaintiff's* race, and that such comments, when overheard, "are the sorts of offhanded comments and isolated incidents' that the Supreme Court . . . cautioned should not be considered severe or

pervasive enough to constitute a hostile work environment." *Id.* at 263 (internal citations omitted).

Turning to the facts and circumstances presented in this case, Plaintiffs base their hostile work environment claims on "the regular use of racial slurs and . . . the constant presence of race-based graffiti on the Defendants' project at the Hovensa refinery as specifically described in all of the Plaintiffs' testimony collectively." (Doc. No. 655, Att. 1., Pls.' Opp. Brief). Upon careful review of the evidence, however, the Court believes that the claim for a hostile work environment fails due to a lack of evidence that the discrimination was either (a) pervasive and regular, or (b) sufficiently severe so as to change the terms and conditions of employment.

As an initial matter, the Court discounts the circumstances of Plaintiffs' termination as an event so singularly severe as to independently support a claim of a hostile work environment. As such, the Court turns to Plaintiffs' other evidence of derogatory comments and graffiti in order to weigh whether a hostile work environment claim has been sufficiently alleged.

With respect to racial slurs, only Bynoe and Smith offer general testimony as to the regularity of racial slurs; however, neither individual provided a clear context of the severity nor the effect such comments had.[14] Next, the remaining Plaintiffs offer testimony of discriminatory comments that were only overheard or rumored, or only report having heard such comments

---

[14] Bynoe alleges that he was personally subjected to racial slurs several times, and that the company contracting with PIC brought in people from the states who said "these black men, they don't know what they're doing, and Cruzian guys don't know what they're doing." (Doc. No. 620, SUMF, ¶ 65c). Bynoe asserts that Puerto Ricans used language such as "these black Cruzian Men." Finally, Bynoe alleges that Saucier on one occasion got a call and said, "Goddamn it, I can't work with these colored guys," and on another occasion said, "you colored boys, I cannot work with you colored men." (Doc. No. 620, SUMF, ¶ 65c). Smith, similar to Bynoe, alleges that Mr. Saucier would make comments to Mendez such as "I don't want to work with those colored boys," and that he complained to Mendez about Saucier's use of the word "boys" and the term "hey, you" on multiple occasions. (Doc. No. 620, SUMF, ¶ 99).

once.[15]  There are no reports that any comments were physically threatening.  These facts seem

most similar to those in *City of Trenton*, in which the Third Circuit rejected the plaintiff's hostile

work environment claim.  *See* 420 F.3d at 263.  Next, to the extent that Plaintiffs' complaints

rely upon Saucier's comments, Saucier's public apology for his discriminatory comments and his

warning and reprimand mitigate the negative impact of those statements.  *See Mufti v. Arsand &*

*Co., Inc.*, 667 F. Supp. 2d 535, 549 (W.D. Pa. 2009) (taking into account Defendant's responsive

actions when determining, in the context of a hostile work environment claim, whether or not the

record reflected sufficient evidence of discriminatory treatment based upon race).  Finally, as

detailed previously, there are no reports of further discriminatory comments from Saucier

following the public apology.

  With respect to the alleged constant presence of race-based graffiti, of the remaining

Plaintiffs, only Smith offers testimony as to its persistence, and only one person in the record

testified to having reported the graffiti to management, thus giving management the opportunity

to clean up and respond to the graffiti.

  In consideration of the above evidence, the Court does not find that Plaintiffs, either on

---

[15] Concepcion overheard Saucier make references to "those Puerto Ricans," which she found to
be offensive. (Doc. No. 646, Att. 9, Ex. 34, Concepcion Dep. 50:19-25).  Mendez testified that
aside from handling the Saucier-Pagan Incident, the actual events of which he did not witness, he
never encountered any racially derogatory comments.  (Doc. No. 620, SUMF, 87(d)).  Pagan
testified that the Saucier-Pagan Incident marked the only time he heard offensive language on the
project, other than rumors that Saucier called Hispanics "spics."  Pagan himself is brown-skinned
Puerto Rican whose wife is black. Carrasco, aside from testifying as to PPSI's Abraham Ramirez
calling him a "fucking Dominican" and a "Dominican" during a dispute in the field, gave only
vague testimony, without examples or support, that he was treated like he was inferior, that
people looked down on him because of the color of his skin, and that he heard rumors that other
racist comments had been made on the project.  (Doc. No. 620, SUMF, ¶ 66b-c; Carrasco – Ex.
32, 35-36).  Gonzalez testified that, while he did not, prior to termination, experience anything
that he believed he was racially discriminatory, he did, at some point, have to confront other
workers who were referring to him as "Santo."  After this confrontation, the coworkers ceased
using the term.  He never made any complaints to PIC, PPSI, or Hovensa about the situation.
(Doc. No. 620, SUMF, 75(b)).

an individual basis or via the amalgamation of their claims, have sufficiently raised a genuine issue of material fact with respect to a hostile work environment claim.  While the Court finds such derogatory comments in the workplace and on the bathroom walls to be repugnant and unacceptable, these complaints simply do not rise to the level of extreme or severe conduct required in this instance.

  iii.    <u>Retaliation</u>

      Turning, then, to the question of unlawful retaliation, the anti-retaliation provision of Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  This provision does not protect an individual from all retaliation, just that which "produces an injury or harm."  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

      To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: "(1) the employee engaged in a protected activity; (2) the employer subjected the employee to an adverse employment action after or contemporaneously with the employee's protected activity; [and] (3) a causal link exists between the employee's protected activity and the employee's adverse action."  *Warner v. Kmart Corp.*, Civ. No. 2005-0128, 2009 WL 1476476 (D.V.I. May 27, 2009); *Moore v. City of Philadelphia*, 461 F.3d 331, 340-42 (3d Cir. 2006); *Nelson v. Upsala Coll.*, 51 F.3d 282, 286 (3d Cir. 1995).

      Protected activity includes participation in certain Title VII proceedings and opposition to discrimination made unlawful by Title VII.  *Moore*, 461 F.3d at 341.  An adverse employment

action is conduct that is "likely to deter victims of discrimination from complaining to the EEOC." *Hare v. Potter*, 220 F. App'x 120, 127 (3d Cir. 2007) (finding that excluding an employee from a weekly training lunch that contributes to an employee's advancement or ordering an employee to undertake dirtier or more arduous tasks could constitute adverse employment actions); *see also Burlington Northern*, 548 U.S. at 68 (quoting *Rochon v. Gonzales* 438 F.3d 1211, 1219 (D.D.C. 2006)) (finding that the plaintiff must show that the purportedly retaliatory action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."). Significantly, the action must be one that a "*reasonable* employee would have found . . . materially adverse." *Burlington Northern*, 548 U.S. at 68 (emphasis added).

As to the question of causation, causation is inherently "fact intensive;" the mere belief that an act constituted retaliation, without specific conduct to support such inference, is insufficient to establish such a claim. *See, e.g., Brown-Baumbach v. B&B Automotive, Inc.*, Civ. No. 09-3962, 2010 WL 2710543, at *15 (E.D. Pa. Jul. 7, 2010) *aff'd in part, reversed in part by Brown-Baumbach v. B&B Automotive, Inc.*, 437 Fed. App'x 129 (3d Cir. 2011).

The Court may consider "a broad array of evidence in determining whether a sufficient causal link exists to survive a motion for summary judgment." *LeBoon v. Lancaster Jewish Comty. Ctr. Ass'n*, 503 F.3d 217, 232-34 (3d Cir. 2007). Temporal proximity alone may support the inference of causation where it is "'unusually suggestive of retaliatory motive.'" *Jenson v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006) (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997)) *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). However, "there is no bright line rule as to what constitutes unduly suggestive temporal proximity." *Id.* at 232 (citing *Clark Cnty. School Dist.*, 432 U.S. at 27).

(finding that a gap of three months between the protected activity and the adverse action, without more, is insufficient to create an inference of causation and defeat summary judgment).

Finally, "if 'temporal proximity . . . is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Id.* (quoting *Krouse*, 126 F.3d at 503-04). While "timing and ongoing antagonism have often been the basis of the causal link . . . [a] plaintiff [may] substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

Plaintiffs contend that, following the Saucier-Pagan Incident, they banded together and protested the discriminatory comments in public meetings, and that they were subsequently terminated as a result.

PPSI counters this assertion, arguing that Plaintiffs did not engage in conduct protected by Title VII's anti-retaliation provision, and so cannot bring forward a claim of retaliation where an individual may, pursuant to the statute, only bring claims based on adverse employment actions stemming from that individual's conduct.

In considering these assertions, the Court acknowledges that the evidence is tenuous with respect to whether Plaintiffs who merely attended the meetings following the Saucier-Pagan Incident at which the racist comments were discussed actually engaged in protected activity. As argued by PPSI, an employee showing up at a public meeting to which that employee has been called seems qualitatively different than that same employee independently protesting discriminatory conduct. (Doc. No. 665, 10). However, the Court notes that at least two Plaintiffs, Mendez and Pagan, appear to have legitimate claims for having participated in

protected activity,[16] and the remaining Plaintiffs might plausibly bring claims based upon the conduct of Mendez and Pagan alone, their conduct alone, even if their presence at public meetings does not qualify as engaging in protected conduct.

While traditionally the Court has been mindful of the need to construe Title VII so as to conform with Congress' intentions, the Court is persuaded that extending the zone of retaliation to include Plaintiffs aside from Mendez and Pagan is consistent with the purposes of Title VII. Most significantly, in *Thompson v. North American Stainless, LP*, 131 S. Ct. 863 (2011), the Supreme Court held that the anti-retaliation provision of Title VII protected the fiancé of the person who had engaged in the protected activity. 131 S. Ct. at 870. The Court found that the plaintiff's injury was not accidental but the means by which the employer intended to punish his fiancé. *Id.* In reaching this determination, the Supreme Court noted that "the purpose of Title VII is to protect employees from their employers' unlawful actions." *Id.*

While *Thompson* is certainly distinguishable from the present situation in that Plaintiffs do not bear a close relation or association to one another, the Court finds that its logic could expand to encompass the present situation, should the evidence otherwise support a retaliatory motive on the part of PPSI against PIC or Plaintiffs individually. Indeed, the Third Circuit – relying upon the reasoning in *Thompson* – found that § 1983 plaintiffs could bring claims of retaliation where they suffered an adverse employment action as a result of their employer's desire to retaliate against a third party's conduct. *See Montone v. City of Jersey City*, 709 F.3d 181, 197-98 (3d Cir. 2013).

Thus, in determining which plaintiffs might bring claims for retaliation based upon their own protected activity or that of Mendez and Pagan, the Court can immediately eliminate two:

---

[16] According to testimony in the record, Pagan reported Saucier's comments to Mendez, and that Mendez and Pagan attended a separate meeting with GE, Hovensa, PPSI and PIC where the incident was discussed.

Carrasco and Smith. With respect to the former, the Court is not satisfied that Carrasco has shown that he engaged in protected activity so as to trigger protection against retaliation under Title VII. His termination followed a dispute with a supervisor in the field in which a discriminatory comment was used. While such termination may have been discriminatory, there is no evidence to support that it was retaliatory.

With respect to Smith, the Court finds the period of time between the Saucier-Pagan Incident, September 2004, and his termination, December 2004, is not suggestive of retaliatory animus. Looking to the intervening period, then, to gauge whether context provides evidence of such animus, the Court finds that the record is devoid of discriminatory actions that would make Smith's termination suggestive of retaliation. Moreover, PPSI has provided a legitimate, nondiscriminatory reason for the December 2004 termination – the severance of the contract between PPSI and Hovensa/GE and the subsequent severance of PPSI's contract with PIC. Plaintiffs have failed to demonstrate such implausibilties and inconsistencies in this justification so as to expose it as pretext and warrant sending the question of retaliatory termination with respect to Smith to the jury.[17]

Turning, then, to the remaining five Plaintiffs – Bynoe, Concepcion, Gonzalez, Pagan, and Mendez – the Court notes that there is nothing during the actual execution of the termination to demonstrate that it was conducted in retaliation for the protected activities of Mendez, Pagan, or any of the other Plaintiffs in response to the Saucier-Pagan Incident. Looking, then, to the timeline of events, the Court notes that the timing of the October 2004 layoff, some four to six weeks after the Saucier-Pagan Incident, is neither clearly retaliatory nor clearly non-retaliatory.

---

[17] The fact that PPSI's Andy Herrera testified that PPSI may have brought on additional people around the same time as PIC's December termination to "help out" with finishing off the project, and with no further evidence as to the positions or work those additional employees may have completed – is insufficient to demonstrate that PPSI's justification for Smith's December termination is mere pretext.

*See, e.g.*, *Farrell v. Planters Lifesavers Co.*, 206 F.3d at 278-79 (3d Cir. 2000) (declining to find whether the three to four week period between plaintiff's rejection of defendant's sexual advance and termination was, alone, sufficient to support a *prima facie* claim of retaliation, although noting that it was suggestive in context); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding two days between the protected activity and the alleged retaliation sufficient to support an inference of causation); *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760-61 (3d Cir. 2004) (finding that time period of two months was not unduly suggestive, and required the court to look to surrounding circumstances); *but see Galloway v. Islands Mech. Contractor, Inc.*, Civ. No. 2008-071, 2012 WL 3984891 (D.V.I. Sept. 11, 2012) ("there is a close temporal proximity – approximately two months – between the alleged Jones Statement and Plaintiff's termination").

Looking to the events surrounding the Incident, then, the Court notes (1) the testimony from certain Plaintiffs that relations cooled between PPSI and PIC following the Incident; (2) the testimony that prior to the Incident, PPSI supervisors Saucier and Herrera purportedly made derogatory comments; and (3) the evidence of derogatory graffiti in the port-a-johns. There is also Mendez' testimony that Redford, following a private management-based meeting discussing the Saucier-Pagan Incident, stated that "PIC would go before Saucier would go."[18]

Assuming the above evidence is sufficient to create a presumption of retaliatory action, the rebuttal evidence includes the fact that (1) Saucier received a warning and a reprimand in response to his actions; (2) there were no further reports of derogatory comments from Saucier following the Incident; (3) there is evidence that Mendez was fired for cause for failure to

---

[18] Plaintiffs also repeatedly emphasize the purportedly close personal relationship between Saucier and Redford, to bolster the contentions that Redford would dismiss Plaintiffs in retaliation for lodging complaints against Saucier.

adequately perform as PIC Project Manager; and (4) that the remaining Plaintiffs had to be laid off as part of a general reduction in force in response to asserted productivity issues.

In an attempt to expose the above rebuttal as pretextual, Plaintiffs contend that the allegations of poor productivity on the part of Plaintiffs only arose after the Saucier-Pagan Incident.  Plaintiffs point to Hovensa's Senior Project Manager Robert Burkhalter's testimony that in the summer of 2004, "it was [Hovensa's] feeling and belief that . . . PPSI should have brought on more individuals, more workers to get the project back on schedule around July of '04ish, mid late summer of '04."  (Doc. No. 647, Att. 10, Ex. 47, Dep. Burkhalter, 24:4-11).

Upon review of the evidence, Court believes that Plaintiffs have failed to raise a genuine issue of material fact with respect to Plaintiffs' retaliatory termination.  The lack of clear temporal proximity or discriminatory conduct in the intervening period, combined with the fact that Plaintiffs' evidence with regards to PPSI's alleged productivity issues – namely Burkhalter's testimony concerning productivity in summer 2004 – does not apply to relevant time period for the events in question (fall 2004), results in a failure to expose PPSI's legitimate, nondiscriminatory reason for termination, a justified reduction in force, as mere pretext.  *Cf. LeBoon v. Lancaster Jewish Community Center*, 503 F.3d at 232-34 (finding that, despite plaintiff's attempts to point out inconsistencies in defendant's justification for her termination, there could be little doubt as to defendant's dire financial straits during the relevant period and that, while the "financial difficulties in themselves [did] not explain why [plaintiff] in particular was fired, [defendant's] explanation [was] not so inconsistent or incongruous, in the absence of any other evidence, as to give rise to an inference that [plaintiff] was terminated because of her protected activity.").

Thus, even construing all of the proffered evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have not raised a genuine dispute of material fact with respect to the question of retaliatory termination.

iv.   Conclusion with respect to Count I

Based upon the above findings, the Court will grant summary judgment in favor of PPSI with respect to Count I except as concerns Carrasco's claim for discriminatory termination.

B.   Count II: the Virgin Islands Civil Rights Act, Title 10 V.I.C. §§ 1-10, §§ 64, *et seq.*, 24 V.I.C. § 451

In Count II of the Second Amended Complaint, Plaintiffs assert that PPSI violated VICRA.  VICRA, similar to Title VII prohibits various forms of discrimination based upon race, creed, color, or national origin.  10 V.I.C. § 3.  As VICRA is similar in both structure and intent to Title VII, and as Plaintiffs did not object to Defendants' use of *McDonnell Douglas* in their burden-shifting analysis, the Court will apply the analysis conducted in Count I for Plaintiffs' Title VII claims to Plaintiffs' VICRA claims as well.  *See, e.g.*, *Desir v. Hovensa, LLC*, Civ. No. 2007/97, 2012 WL 762122, at * 6 (D.V.I. 2012) (applying the *McDonnell Douglas* framework to VICRA claims where Defendants offered no objection).  As a result, the Court finds that the only claims arguably preserved under VICRA are those concerning Carrasco's purportedly discriminatory termination.

C.   Count III: Breach of the Implied Covenant of Good Faith and Fair Dealing

In order to prevail on a claim for breach of the implied covenants of good faith and fair dealing, a party must prove: "(1) that a contract existed between the parties, and (2) that, in the performance or enforcement of the contract, the opposing party engaged in conduct that was fraudulent, deceitful, or otherwise inconsistent with the purpose of the agreement or the

reasonable expectations of the parties." *LPP Mortgage Ltd. v. Prosper*, 2008 WL 5272723, at *2

(D.V.I. Dec. 17, 2008) (citing, *inter alia*, the Restatement (Second) of Contracts § 205).

      To successfully allege an act of fraud or misrepresentation, "a complainant must

demonstrate (1) a knowing misrepresentation, (2) intent by the defendant that the plaintiff would

rely on the false statement, (3) actual reliance, and (4) detriment as a result of reliance."

*Galloway v. Islands Mech. Contractor, Inc.*, Civ. No. 2008-071, 2012 WL 3984891, at *17

(D.V.I. Sept. 11, 2012) (quoting *Mendez v. Coastal Sys. Dv't, Inc.*, 2008 WL 2149373, at *10

(D.V.I. May 20, 2008)).

      Putting aside, for a moment, Defendant's contentions that no contract existed between

Plaintiffs and Defendant such that there could be a breach, the Court finds that Plaintiffs have

failed to provide evidence that they detrimentally relied upon PPSI's and PIC's purportedly

fraudulent reasoning for their termination, and thus, cannot support a claim for breach of the

implied covenant of good faith and fair dealing.  The Court finds the analysis in *Galloway*

instructive.  In *Galloway*, the court found that even though the plaintiff had created a genuine

issue of material fact with respect to whether or not he was terminated for discriminatory

reasons, he had failed to provide any evidence that he detrimentally relied upon his employer's

contentions that there was no overtime work available for him. 2012 WL 3984891 at *18.

Indeed, the plaintiff had challenged his employer's actions in his Department of Labor

Complaint.  2012 WL 3984891 at *18.

      Similarly here, the Court finds that Plaintiffs have failed to demonstrate that they relied

upon PPSI's purported misrepresentations with respect to their termination.[19]  It is undisputed

---

[19] To the extent Plaintiffs may argue that PPSI misrepresented that it would investigate and
resolve the matter of Saucier's discriminatory comments, the Court does not find that Plaintiffs
have demonstrated that PPSI's warning and reprimand, as well as PPSI's internal investigation of
that incident, constituted an actual misrepresentation.

that Plaintiffs filed complaints with the EEOC and lawsuits in federal court not long after their termination, and that certain Plaintiffs protested outside of the refinery gates upon their dismissal.  Accordingly, the Court will grant summary judgment to PPSI with respect to the purported breach of the implied covenant of good faith and fair dealing.

D.  Count IV: Violations of the Virgin Islands Wrongful Discharge Act, 24 V.I.C. §§ 76-79

In order to be eligible for protection under the Virgin Islands Wrongful Discharge Act (the "WDA"), a purported employee must have been employed by an employer for at least six months.  V.I. Code Ann. tit. 21, § 62.  Plaintiffs admit that the record does not demonstrate that any of the relevant parties worked for that length of time on the project.  Thus, for good cause shown, the Court grants summary judgment as to Count VI of the Second Amended Complaint.

E.  Count V: Intentional and/or Negligent Infliction of Emotional Distress

With respect to Count V, the Court finds that Plaintiffs have failed to demonstrate a *prima facie* case of either an intentional or negligent infliction of emotional distress.  As concerns the former, "the Virgin Islands recognizes the tort of intentional infliction of emotional distress as defined in the Restatement (Second) of Torts § 46 (1965)."  *Thomas Hyll Funeral Home, Inc. v. Bradford*, 233 F. Supp. 2d 704, 714 (D.V.I. 2002) (citing *Seafarers Int'l Union of North America v. Thomas*, 42 F. Supp. 2d 547, 557, n. 11 (D.V.I. App. Div. 1999)).  Pursuant to § 46(1), a plaintiff wishing to prevail on such a claim must demonstrate that a defendant has "by extreme and outrageous conduct intentionally or recklessly cause[d] [plaintiff] severe emotional distress."  Restatement (Second) of Torts § 46 (1965).

The conduct must have been "so outrageous in character, and so extreme in degree, *as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*"  *Id.* at § 46 cmt. d.; *Thomas Hyll Funeral Home, Inc.*, 233

F. Supp. 2d at 714 (citing *Seafarers Int'l*, 42 F. Supp. 2d at 557). In the employment context, "[i]t is extremely rare to find conduct . . . that will rise to the [requisite] level of outrageousness." *Greene v. Virgin Islands Water & Power Auth.*, 1:06-CV-11, 2011 WL 3032466 (D.V.I. July 22, 2011), *reconsideration denied,* 1:06-CV-11, 2012 WL 4755061 (D.V.I. Oct. 5, 2012) (quoting *Ramos v. St. Croix Alumina, L.L.C.,* 277 F. Supp. 2d 600, 604 (D.V.I. 2003) (overruled in part on other grounds)). "Discrimination alone does not state a claim for intentional infliction of emotional distress." *Id.*

Upon a thorough review of the record, the Court does not believe that the evidence of racially derogatory graffiti and comments, as well as the termination of Plaintiffs' employment, demonstrates the kind of outrageous conduct or the severe emotional distress required for a finding of IIED. Those Plaintiffs who did testify to experiencing symptoms of distress after termination testify to nervousness, lack of sleep, lack of concentration, and depression.[20] Many of these symptoms did not last, were not severe enough so that a doctor was consulted, or were not explicitly connected with the termination itself. These symptoms fall short of the conduct and distress that have led other courts to permit a claim of IIED to proceed past summary judgment. *See, e.g., Hare v. H&R Indus., Inc.*, 67 Fed. App'x 114 (3d Cir. 2003) (finding sufficient support for a claim of IIED where plaintiff's boss and coworkers harassed her at least ten different times over the course of four months, leading her experience symptoms such as

---

[20] *See, e.g.*, Carrasco, Doc. No. 620, SUMF-Merits, ¶ 67f, RSOF, ¶ 67f (testifying to nervousness, lack of sleep, and lack of concentration); Concepcion, Doc. No. 620, SUMF-Merits ¶ 68e (testifying to depression and emotional problems following termination, with no physical symptoms); Gonzalez, Doc. No. 620, SUMF-Merits, ¶ 75e (testifying he "felt bad" and was depressed following his layoff, but never saw a mental health professional or have physical problems); Hernandez, Doc. No. 647, Att. 2, Ex. 39, Hernandez Dep. 65:8-15; 66 (testifying to difficulties dealing with expenses following termination; had no insurance or money for private doctor and did not go to the Department of Health for services); Jones-Charleman, Doc. No. 620, SUMF-Merits, ¶ 81e (testifying to emotional distress in that the termination "messed him up a little," but he never saw a counselor or psychologist for any mental or emotional problem).

daily vomiting and suicidal thoughts).

Similarly, with respect to the purported *negligent* infliction of emotional distress, the Court finds that Plaintiffs have failed to produce evidence to demonstrate that negligent conduct on the part of PPSI either (1) endangered Plaintiffs' safety or (2) caused emotional distress to the extent that Plaintiffs suffered physical harm. *Fenton v. C&C Constr. & Maint., Inc., et al.*, 48 V.I. 263 (V.I. Super. 2007); *Mingolla v. Minnesota Min. & Mfg. Co.*, 893 F. Supp. 499, 506 (D.V.I. 1995).  Although Plaintiffs argue their pain was physical, their symptoms – nervousness, lack of sleep, lack of concentration, and depression – have been frequently rejected as physical by courts.  *See, e.g.*, *Cohler v. U.S. ex rel. Nat. Park Services*, 49 V.I. 1057 (D.V.I. 2008) (finding undisputed evidence that plaintiff suffered from, *inter alia*, "mental anguish, emotional distress, pain and suffering, depression, anxiety, fear for [her] father's life . . . insomnia," insufficient to support a claim of negligent infliction of emotional distress, as such injuries are "clearly emotional and therefore non-compensable."); *Seafarers Int'l. Union of North America v. Thomas*, 42 F. Supp. 2d 547, n. 12 (D.V.I. 1999) (noting in a footnote that appellants' claims of anxiety and depression are also insufficient to support a claim of negligent infliction of emotional distress).  Plaintiffs have also failed to provide evidence that their safety was in danger.  Thus, the Court grants summary judgment in favor of PPSI with respect to Count V of the Second Amended Compliant.

F.   Count VI: Tortious Interference with an Employment Relationship

Turning to Count VI of the Second Amended Complaint, Plaintiffs allege that the actions of PPSI constituted tortious interference with Plaintiffs' employment relationship with PIC.  As an initial matter, the Court notes that there is a genuine issue of material fact with respect to whether or not PPSI is Plaintiffs' joint employer.  If PPSI is a joint employer, the inquiry of

tortious interference is arguably moot.  However, if a jury does not find that PPSI was Plaintiffs'

joint employer, PPSI may still be liable for Plaintiffs' termination on a theory of tortious

interference.  Under the Restatement (Second) of Torts,

> [o]ne who intentionally and improperly interferes with the performance of a contract
> (except a contract to marry) between another and a third person by inducing or otherwise
> causing the third person not to perform the contract, is subject to liability to the other for
> the pecuniary loss resulting to the other from the failure of the third person to perform the
> contract.

Restatement (Second) of Torts, § 766 (1979).

In the Virgin Islands, a plaintiff attempting to show tortious interference must demonstrate:

> (1) [that] a contractual relationship existed between the plaintiff and a third party; (2) the
> defendant knew about the contract; (3) the defendant intentionally and improperly interfered
> with the contract; (4) the interference was the proximate cause of one party to the contract
> failing to perform; (5) the defendant intended to harm the plaintiff by interfering with the
> contract; and (6) the non-performance resulted in harm to the plaintiff.

*Pourzal v. Marriott Int'l, Inc.*, 2006 WL 2471695, at *2 (Aug. 17, 2006) (citing *Gov't Guarantee*

*Fund of Republic of Finland v. Hyatt Corp.*, 955 F. Supp. 441, 452 (D.V.I. 1997)).  In

considering whether the purported interference was improper, the Court must consider, *inter*

*alia*, the nature of the actor's conduct, the actor's motive, the interests of the other party with

which the actor's conduct interferes, the interests sought to be advanced by the actor, the societal

interests in protecting the freedom of action of the actor and the contractual interests of the other,

and the relations between the parties.  *Gov't Guarantee Fund*, 955 F. Supp. at 452.

Here, PPSI disputes that there was ever a valid contract between Plaintiffs and PIC, on

the basis that there was no written contract, and that any oral contract would have been invalid

under the statute of frauds.  The Virgin Island Statute of Frauds reads in relevant part:

> In the following cases every agreement shall be void unless such agreement, or some note
> or memorandum thereof is in writing, and subscribed by the party to be charged
> therewith, or by his lawful agent under written authority:

> (1)   An agreement that by its terms is not to be performed within one year
> from the making thereof.

28 V.I. C. § 244.

PPSI argues that because Plaintiffs have made no allegations "suggesting that any alleged verbal employment contracts, *by their own terms*, provided that Plaintiffs' employment with PIC was for a term of less than one year," Plaintiffs' employment contracts would, under the statute, be invalid. (Doc. No. 616). Plaintiffs, however, urge the Court to interpret the Statute of Frauds as signifying that the agreement must explicitly state, by its terms, that it *cannot* be performed within one year to be invalid. *See, e.g., Smith v. Robson*, 44 V.I. 56 (2001) (speaking of a partnership/joint venture relationship: "because the agreement did not set forth any specific term, the resulting relationship was terminable at will, and, as a result is not within the Statute of Frauds . . . . the fact that [the agreement's] completion within a year was unlikely is irrelevant."). The Court declines to rule on the issue here, and assumes, for the purposes of this summary judgment motion, that an employment contract between PIC and Plaintiffs did, in fact, exist.

However, upon consideration of the facts and the evidence, the Court finds that only Plaintiff Carrasco's claim will survive summary judgment, as there is a genuine issue of material fact as to whether or not his termination was discriminatory. PPSI's direction of PIC to fire Carrasco would then arguably have constituted improper interference. However, as Plaintiffs have failed to demonstrate that the termination of the remaining six Plaintiffs was either discriminatory or retaliatory, and that otherwise, PPSI had contractually reserved the right to remove personnel from the refinery and to expand and contract the workscope, the Court finds that Plaintiffs have also failed to demonstrate that any interference on the part of PPSI in terms of Plaintiffs' employment was actually improper.

Thus, the Court grants summary judgment in favor of PPSI with respect to Count VI, except as concerns any claims Carrasco may bring concerning retaliatory discrimination.

G. <u>Count VII: Punitive damages</u>

The final Count in Plaintiffs' Second Amended Complaint contends that PPSI's actions are so outrageous and done with such reckless disregard for the rights and interests of the Plaintiffs as to entitle them to an award of punitive damages. (Doc. No. 558, Sec. Amd. Compl., ¶ 153). PPSI seeks summary judgment on this claim on the contentions that there is no separate cause of action for punitive damages, *McDonald v. Davis*, 51 V.I. 573 (D.V.I. 2009) (reviewing list of cases wherein courts dismissed separately pleaded punitive damages counts), and that PPSI's conduct is insufficiently malicious or outrageous so as to warrant to the award of punitive damages in this instance.

The Court will therefore grant PPSI's motion with respect to the claim for punitive damages, noting, however, that such dismissal is granted without prejudice should the evidence at trial reveal a basis for their award. *McDonald*, 51 V.I. 573, n. 21.

CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment on the Merits with respect to PPSI as to all remaining Plaintiffs, except as concerns Plaintiff Carrasco's claims of discriminatory termination and tortious interference of contract. The motion for summary judgment is dismissed as moot with respect to Fluor, FEI, and P2S, as such parties have already been dismissed from this action in separate Court Orders. (Doc. Nos. ___, ____ ). An appropriate Order accompanies this Opinion.

ANNE E. THOMPSON, U.S.D.J.

Dated: 10 / 8 / 13